Filed 6/14/13  Yard v. Waring CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| DESTINY YARD,<br><br>    Plaintiff, Cross-defendant and<br>Appellant,<br><br>        v.<br><br>KEITH J. WARING,<br><br>    Defendant, Cross-complainant and<br>Respondent. | G047316<br><br>(Super. Ct. No. 30-2012-00548337)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Gregory H. Lewis, Judge.  Affirmed.

Law Offices of Lawrence A. Strid and Lawrence A. Strid for Plaintiff, Cross-defendant, and Appellant.

Sands Lerner, Neil S. Lerner and Arun Dayalan for Defendant, Cross-complainant, and Respondent.

The trial court denied Destiny Yard's motion to strike Keith J. Waring's cross-complaint as a strategic lawsuit against public participation (SLAPP).  (See Code Civ. Proc., § 425.16.)[1]  Because Waring's claims do not arise from protected activity, we affirm the court's order.

FACTS

In July 2010, Waring led an excursion aboard his seafaring vessel, the Perro Grande.  Yard was one of the invited passengers.  At some point, Yard fell off the "flying bridge" and struck the railing of the vessel as she plummeted into the sea.  Yard suffered injuries and incurred medical bills as a result of her injuries.

In February 2012, Yard filed a complaint against Waring, alleging that Waring's negligence was the cause of her injuries.  To wit, Yard claims Waring "negligently and carelessly allowed his passengers access to the flying bridge of the vessel while it was in open sea, when he knew or should have known that it would be unreasonably dangerous" to allow such access.  Yard seeks general damages in excess of $25,000, medical and incidental expenses, lost earnings, interest, and costs of suit.

In April 2012, Waring answered the complaint and filed a cross-complaint. Waring's pleadings deny his own negligence and instead allege that Yard's negligence was the cause of her injuries (i.e., Yard consumed alcoholic beverages then traversed beyond a protective railing whereupon she began dancing and/or practicing yoga). Waring's answer does not allege the existence of an enforceable general release as an affirmative defense.

Waring's cross-complaint asserts causes of action for breach of implied-in-fact contract and fraud/false promise against Yard.  Waring alleges that Yard contacted

---

[1]     All statutory references are to the Code of Civil Procedure.

2

him in October 2010 for help in paying her medical bills. Waring notified his insurer, which agreed to pay Yard's medical bills so long as Yard signed a release of all Waring's liability. Yard promised to sign the release, but Yard subsequently refused to do so even after medical bills had been paid. Yard was unjustly enriched and Waring was harmed in excess of $25,000. In sum, Waring wants his (or his insurer's) money back. Despite his allegation of an "implied-in-fact" contract, Waring does not want to enforce the prelitigation settlement agreement (i.e., Yard keeps the money she received and her case is dismissed based on the general release).

In response to the cross-complaint, Yard filed an anti-SLAPP motion. By declaration, Yard detailed her injuries and stated her "total billed medical expenses to date are in excess of $126,000." Yard's "health insurance lapsed after the subject incident and most of the medical expenses were therefore not covered." After the incident, Yard corresponded (mostly by e-mail) with adjusters at Chartis Marine Adjusters (Chartis), the third party administrator for Waring's insurer, as well as Neil Lerner, an attorney retained by Chartis. "Chartis and . . . Lerner advised [Yard] that Chartis would defer [her] medical expenses if [she] were to sign a release of liability claims as against . . . Waring. Although Chartis did reimburse [Yard] for some of [her] medical expenses, there was never a final agreement ever arrived at between [the parties] as to the maximum amount that Chartis would pay." Lerner sent Yard a "proposed written release offering to pay a maximum of $45,749.78 . . . . [Yard] received this proposed release in July of 2011, but [she] never agreed to be paid this amount as payment in full and [she] therefore never signed the release, due to [her] concern that it would not be sufficient to defray [her] current and future medical expenses."[2] Yard never

---

[2] Yard attached a copy of the unsigned general release to her declaration. The operative terms included payment of up to $45,479.78 in medical bills, costs, and expenses to Yard in consideration for her full release of all known and unknown claims against Waring.

3

communicated with Waring himself about an agreement to pay medical bills in exchange for a release.

Waring opposed the anti-SLAPP motion. In his declaration, Waring claimed that Yard contacted him in October 2010 asking for help with her medical bills arising from the incident. Waring contacted Chartis, which indicated "it would assist . . . Yard, on [Waring's] behalf, under the terms of [Waring's] insurance policy." At no time during Yard's discussions with Waring did Yard mention a lawsuit or the threat of a lawsuit. Yard did not threaten litigation until Waring received a demand letter from Yard's lawyer in December 2011.

Robert A. Milana, the director of Marine Liability for Chartis, also submitted a declaration in opposition to the anti-SLAPP motion. Chartis representatives met with Yard and Yard's mother in October 2010, and discussed Yard's injuries and treatment. Chartis, on behalf of Waring, agreed to pay Yard's medical bills (up to approximately $50,000) in exchange for her signing a release of all claims. Milana explained to Yard that the insurance policy did not cover her injuries because her intoxication and reckless behavior was the cause of the incident, but that Chartis was willing to pay in exchange for a release. Yard never mentioned the possibility of filing a lawsuit until Yard's lawyer sent a demand letter in December 2011.

Milana attached an e-mail string to his declaration, in which Milana wrote to Yard on March 31, 2011, "If you want to schedule something you can. Believe we have an agreement with surgeons/hospital for reduced amount — hopefully in the $30,000 range. Labs and misc[ellaneous] will be a few thousand. You will need some [physical therapy] for a few months which we will pay. You will need some recovery time so we want you to have funds to pay bills. [Another Chartis agent] promised more than the medical limit which we will do. We need to place a cap on the amount. I believe all of the above can be accomplished for $50,000. We will pay the big bills direct and you can pay small ones out of balance and keep balance for other expenses. You will

4

need to execute a release which we will send. I wanted you to begin to schedule what you need to do with Dr. Kim. Thanks." Yard responded two hours later: "Oh my I have tears of joy right now! Thank you so very much I can't believe I'm getting my life back. I will call today, and will sign release as soon as I receive it." Yard reaffirmed during follow-up phone calls that she would sign the release.

As part of her reply brief, Yard submitted a supplemental declaration in which she denied the existence of any "firm agreement" or the presentation of any waiver in which the sum of $50,000 was offered. Yard denied the occurrence of a conversation in which the cause of the incident or the applicability of insurance coverage were discussed. No one from Chartis ever took a statement from Yard as to her version of the facts. As her medical bills accumulated and she was presented with the release, Yard consulted with an attorney because of her concerns that all her bills would not be paid and concerns about the consequences of signing the release. Yard attached an e-mail string (ranging from May 2011 to July 2011) in which she was presented with a copy of the proposed release by Chartis's attorney (Lerner) and Yard expressed concerns about the terms of the release.

The court denied the motion. "The cross-complaint was not based on protected activity that [section] 425.16 covers."

DISCUSSION

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike . . . ." (§ 425.16, subd. (b)(1).) Our review of the court's order denying the motion is de novo, and entails an independent review of the

5

entire record.  (*Ross v. Kish* (2006) 145 Cal.App.4th 188, 197; § 425.16, subd. (b)(2) ["court shall consider the pleadings, and supporting and opposing affidavits"].)

The anti-SLAPP statute "requires the court to engage in a two-step process. First, the court decides whether the [moving party] has made a threshold showing that the challenged cause of action is one arising from protected activity. . . .  [Citation.]  If the court finds such a showing has been made, it then determines whether the [responding party] has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)  We reach only the first step in this case because Yard did not make a threshold showing that the causes of action in the cross-complaint arose from protected activity.

As used in the anti-SLAPP statute, "'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' includes:  (1) *any written or oral statement or writing made before a* legislative, executive, or *judicial proceeding*, or any other official proceeding authorized by law, (2) *any written or oral statement or writing made in connection with an issue under consideration or review by a* legislative, executive, or *judicial body*, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or on an issue of public interest." (§ 425.16, subd. (e), italics added.)

Yard contends the cross-complaint arose out of Yard filing her complaint for damages against Waring (§ 425.16, subd. (e)(1)) and Yard's prior statements made in connection with this lawsuit (*id*., subd. (e)(2)), namely, her alleged promises (or statements of intent) to sign a release.  As stated in Yard's brief, "the pre-suit communications between [Yard] and [Waring's] insurance carrier and attorney constituted settlement negotiations of a pending bodily injury claim, which if finalized

6

would have resulted in a release of claims and a waiver of the filing of any lawsuit by [Yard] against [Waring]. As such, by the very definition of the subject matter being negotiated between the parties, there was a good faith and serious consideration of imminent litigation."

The gravamen of Waring's cross-complaint is that Waring suffered damages and Yard was unjustly enriched as a result of Waring's insurer paying Yard's medical bills[3] in reliance on Yard's unfulfilled promise or statement of intent to sign a document releasing her claims against Waring. As stated in his brief, "Waring believes he will prevail on Yard's complaint; he bears no liability for her injuries. However, since he has already paid Yard's medical bills, she has been unjustly enriched; she got the benefit of their bargain and he got nothing in return." Waring claims he could have filed his action to recover the medical bill expenditures before Yard's complaint was filed, based simply on Yard's failure to follow through on her alleged promise to sign the release.

Our analysis begins with *Navellier v. Sletten* (2002) 29 Cal.4th 82 (*Navellier*).) In *Navellier*, disputes arose regarding the management of an investment fund. (*Id.* at p. 85.) The original organizers of the fund sued an independent trustee of the fund in federal court. (*Ibid.*) A settlement agreement was reached with regard to one of the claims, and the independent trustee signed a release of his claims in connection with the execution of the settlement agreement. (*Id.* at p. 86.) The original organizers filed an amended complaint reflecting the partial settlement of their claims; the independent trustee responded by filing counterclaims against the original organizers.

---

[3] We are reviewing an order denying an anti-SLAPP motion, not a demurrer. Because we address only step one of the anti-SLAPP analysis, we need not address Waring's standing to sue Yard for damages even though it was Chartis that paid the medical bills. For that matter, we have no cause to consider whether the facts as alleged by Waring constitute actionable fraud or an implied-in-fact contract (or whether the more apt cause of action is an implied-in-law quasi-contract).

7

(*Ibid.*)  Relying on the release, the original organizers successfully moved for summary judgment on several of the counterclaims.  (*Id.* at pp. 86-87.)

The original organizers subsequently sued the independent trustee in state court for fraud ("in misrepresenting his intention to be bound by the Release") and breach of contract ("by filing counterclaims in the federal action").  (*Navellier*, *supra*, 29 Cal.4th at p. 87.)  Relying on the plain language of section 425.16, our Supreme Court held that the state court action arose from protected activity.  The independent trustee's "negotiation and execution of the Release . . . involved 'statement[s] or writing[s] made in connection with an issue under consideration or review by a . . . judicial body' [citation], i.e., the federal district court, and his arguments respecting the Release's validity were 'statement[s] or writing[s] made before a . . . judicial proceeding' [citation], i.e., the federal action."  (*Navellier*, at p. 90.)  "A claim for relief filed in federal district court indisputably is a 'statement or writing made before a . . . judicial proceeding' [citation]."  (*Ibid.*)

Obviously, step one of the anti-SLAPP analysis would be satisfied if the facts in this case mirrored those in *Navellier*.  (See, e.g., *Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1408-1409 [cross-complaint for breach of contract based on protected activity, i.e., plaintiff filing complaint despite signing general release in prior action].)  But there are several factual differences in the instant case:  (1) there was no pending litigation (or even an explicit mention or threat of litigation) at the time Yard allegedly promised to execute a release of claims in early 2011; (2) the release was never actually signed by Yard; and (3) the basis for Waring's damages is the expenditure of funds by Chartis to pay Yard's medical bills (not breach of contract damages based on the filing of the complaint by Yard).  Waring argues these differences matter.  Yard's actions and omissions could not have arisen from protected activity because there was no judicial proceeding pending or under consideration by Yard during the relevant time period (late 2010, early 2011).  Yard counters that the prospect of litigation was the implicit basis for

the attempted negotiation of a release of claims by Chartis. Yard also attempts to blur the distinction between her statements to Chartis in late 2010/early 2011 and her conduct later in 2011 (June and beyond) after she had reviewed the proposed release and consulted an attorney.

Waring has the better of the argument. It is clear that not every case involving the enforcement of a settlement agreement satisfies step one of the anti-SLAPP analysis. (See *Applied Business Software, Inc. v. Pacific Mortgage Exchange, Inc.* (2008) 164 Cal.App.4th 1108, 1117-1118 [rejecting extension of *Navellier* to cover any case in which breach of settlement agreement is alleged].) An alleged breach of covenants in a settlement agreement to perform certain acts (i.e., to pay money, return copyrighted materials, and provide a certification that all such materials had been returned) (*id*. at p. 1112) "is not protected activity because it cannot be said that the alleged breaching activity was undertaken by defendant in furtherance of defendant's right of petition or free speech" (*id*. at p. 1118). *Delois v. Barrett Block Partners* (2009) 177 Cal.App.4th 940 is also instructive. *Delois* featured a landlord-tenant dispute in which the parties entered into a settlement agreement — prior to any litigation being filed — in an attempt to amicably sever their relationship over the course of four months. (*Id*. at pp. 944-945.) The court concluded that "where, as here, no litigation is ever commenced — although possibly contemplated by one side or another — but, rather, an agreement entered into to resolve the parties' disputes, a later suit alleging breach of that agreement and related tortious conduct *does not* constitute the sort of activity encompassed by the SLAPP statute's first prong." (*Id*. at pp. 948-949.)

Waring's cross-complaint is based on recovering funds disbursed to Yard rather than recovering damages for Yard's protected activity (viz., the filing of the complaint and pre-litigation demands). This is not a case in which the parties actually finalized a settlement agreement, whereupon Yard filed a complaint in contravention of a general release and covenant not to sue. Instead, Chartis paid Yard's medical bills and

9

Yard accepted the payments without signing the general release. By accepting the funds and not signing the release, Yard ate her cake and had it too. The cross-complaint seeks to undo the payment of funds by Chartis on alternative theories that the transaction was either based on a fraudulent false promise by Yard or amounted to an implied-in-fact contract for which Waring is entitled to restitution.[4] The situation presented is akin to the cases cited above in which it was held that attempts to enforce settlement agreements were not based on protected activity.[5]

Waring's cross-complaint was triggered by Yard's complaint, but the filing of the complaint by Yard was not a substantive basis for the cross-complaint. "[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute. [Citation.] Moreover, that a cause of action arguably may have been 'triggered' by protected activity does not entail that it is one arising from such. [Citation.] In the anti-SLAPP context, the critical consideration is whether the cause of action is *based* on the defendant's protected free speech or petitioning activity." (*Navellier*, *supra*, 29 Cal.4th 82, 89.) Waring seeks monetary damages based on Yard's acceptance of funds to pay her medical bills without following through on her alleged promise to sign the release (and, presumably, without offering to return the money), a ground for relief not based on protected activity.

---

[4] Again, we note that it is not necessary in the current procedural context to consider whether a cause of action for restitution based on quasi-contract fits the facts alleged and remedy sought better than the causes of action asserted in the cross-complaint.

[5] Consider a hypothetical question: What if Yard had signed the release and incurred medical expenses in reliance on Chartis's representations, but Chartis then failed to pay as specified by agreement? If Yard then sued to enforce the agreement, it seems obvious that such an action would not be subject to an anti-SLAPP motion because it would be based on Chartis's failure to pay as promised rather than protected activity.

To the extent the cross-complaint is based on statements by Yard (as opposed to the acts of accepting and retaining the Chartis payments), Yard did not establish that her statements about the general release were made in anticipation of litigation. "Statements made before an 'official proceeding' or in connection with an issue under consideration or review by a . . . judicial body . . . as described in clauses (1) and (2) of section 425.16, subdivision (e), are not limited to statements made after the commencement of such a proceeding. Instead, statements made in anticipation of a court action or other official proceeding may be entitled to protection under the anti-SLAPP statute." (*Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 886-887.) But this rule applies only to statements made when litigation is under serious consideration. (*Id*. at p. 887.) Yard failed to make an adequate showing on this point. Her attempt to do so is dependent on confusing the timeline. Yard's promise to sign the release and receipt of the funds from Chartis preceded her consultation of an attorney, refusal to sign the release, and ensuing demand letter.

The parties focus extensively on the litigation privilege in their briefs, with Yard claiming the litigation privilege applies to any alleged statement that she would sign the release agreement. "'The litigation privilege, codified at Civil Code section 47, subdivision (b), provides that a "publication or broadcast" made as part of a "judicial proceeding" is privileged.'" (*Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741, 766.) Although the applicability of the litigation privilege is not coextensive with an examination of whether an action is based on protected activity, courts often consider whether the litigation privilege applies to an alleged communication for help in determining whether a threshold showing has been made under step one of the anti-SLAPP analysis. (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1262-1263.) Yard argues that if her statements were privileged then she has also established they were protected activity under the anti-SLAPP law. But consideration of the litigation privilege merely confuses the issue in this case. Yard is not

11

being sued for her statements *qua* statements (e.g., as in a defamation action).  (See *Neville*, at pp. 1258-1259.)  Yard is being sued for accepting Chartis's money and not returning the money when she decided she would not sign the release.  As previously noted, we need not address the merits under step two and therefore decline to explore the applicability of the litigation privilege to the facts of this case.

## DISPOSITION

The order denying Yard's anti-SLAPP motion is affirmed.  Our December 13, 2012 stay order is lifted upon issuance of the remittitur.  Waring shall recover costs incurred on appeal.

IKOLA, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

BEDSWORTH, J.

12